**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CRIMINAL ACTION |
| v. ) | |
| ) | No. 04-20119-04-KHV |
| BRAD VINCENT, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**MEMORANDUM AND ORDER**

On September 8, 2004, a grand jury returned a six-count indictment which, in part, charged Brad Vincent with conspiracy to possess more than five grams of methamphetamine with intent to distribute and knowingly possessing more than five grams of methamphetamine with intent to distribute.[1] Police discovered the methamphetamine on June 8, 2004, after they stopped and searched the car in which Vincent was a passenger. This matter is before the Court on defendant's Motion To Suppress Evidence (Doc. #38) filed November 5, 2004. On December 14, 2004, the Court held an evidentiary hearing. For reasons set forth below, defendant's motion is overruled.

**Factual Background**

Based on the testimony and exhibits at the hearing on defendant's motion, the Court finds the following facts:

On June 8, 2004, Robert Ward told Franklin County Drug Enforcement Unit ("DEU") that Rudy Vopata was trafficking narcotics. Ward agreed to cooperate with the DEU, and he arranged

---

[1] The indictment also charged Vincent with intentionally using a carrying a firearm in relation to a drug trafficking crime.

for Vopata to sell him some methamphetamine. Vopata told Ward to meet him outside Ottawa, Kansas, in a rural area to conduct the transaction.

At approximately 6:00 p.m., DEU officers, including Detectives Curtis Hall and A. J. Schmidt, went to the predetermined location to intercept Vopata. Officers encountered Vopata in a vehicle driven by Caleb Holle. When officers approached the vehicle, they observed what appeared to be methamphetamine in a plastic bag on the front seat between Holle and Vopata.

Officers arrested both Holle and Vopata.[2] They advised Holle of his Miranda rights, and he agreed to talk to the officers. Holle told them that he and Vopata were going to deliver drugs to someone. Holle told officers that they had just came from Vopata's residence. Holle told officers that when they left the residence a female named Jennifer was present. The officers asked Holle if anything illegal was in the house. Holle stated that marijuana was on a table in the living room.

Several officers then drove to Vopata's residence to seek permission to search the house from any residents who might be there or to secure the residence while seeking a search warrant. When officers arrived, they met Jennifer Ball and Kenny Bellinger outside the residence. Bellinger had an outstanding warrant for his arrest, so officers took him into custody.

Detective Hall knocked on the door of the residence, and the door came open. Detective Hall saw someone on the couch and announced his presence. The woman on the couch did not move, and officers entered the residence and escorted her from the residence. The officers arrested her and Ball for possession of marijuana. None of the individuals at the scene gave permission to search the residence. Detective Schmidt and several other officers left to transport the arrestees to jail and apply

---

[2] Officers searched the car after the arrest and found a marijuana cigar in the front passenger seat and a shotgun in the trunk.

for a search warrant. In anticipation of the search warrant, Detective Hall, Detective Derrick Feliciano and Detective Casey Crane remained to secure the residence. They sat in front of Vopata's residence between two vehicles. All of the officers were in plain clothes, with police badges on their belts and firearms in holsters.

At about 7:30 p.m., the three officers observed a white Mitsubishi Montero Sport pull into the driveway and stop. Detective Hall could tell that more than two people were in the vehicle. The vehicle was approximately 15 to 20 feet from the detectives. The detectives stood up and walked toward the vehicle. To identify himself as a police officer, Detective Hall raised his shirt-tail to reveal the badge and gun on his belt. He motioned with his left hand toward the vehicle and told the occupants "we [are] the police, we want to talk to you."[3] As the officers continued to approach the vehicle, Detective Hall saw that four people were in the vehicle, and that the driver appeared to be confused and scared. The driver ducked under the dash toward the center of the vehicle, and the other people began to move around. Hall could not see the driver's hands, and when he saw the driver, he was concerned that the driver might be reaching for a weapon. At that point, the officers drew their weapons, yelled "police" and ran toward the vehicle. The vehicle went into reverse and the tires spun and threw gravel.[4] After backing up from the driveway onto the paved road, the vehicle stopped.

---

[3] On cross-examination, Detective Hall stated that when he first approached the car, the windows were rolled up and he did not know whether the occupants could hear him. Defendants presented no evidence, however, that the occupants did not hear him.

[4] On cross-examination, defense counsel asked Hall whether, when the vehicle was backing up and leaving, "it still posed a threat to you?" Hall answered "technically, no." On re-direct, government counsel asked Hall whether occupants in the vehicle still posed a threat. Hall responded, "The occupants could have . . . [i]f they had any firearms."

The detectives ordered the occupants out of the vehicle. Brad Vincent got out of the rear passenger side seat. Hall handcuffed Vincent and told him to roll over and stand up.[5]

Defendant seeks to suppress the evidence found in a search of his person and the vehicle because the stop and search violated his Fourth Amendment protection against unreasonable searches and seizures.

## **Analysis**

Defendant asserts that the stop and search of the vehicle was unreasonable under Terry v. Ohio, 392 U.S. 1 (1967). The government argues that under Terry, the officers had reasonable, articulable suspicion of criminal activity at the time they pulled their weapons and ordered the occupants to get out of the car. See id.

---

[5] In its response to Vincent's motion, the government presented facts concerning drugs seized after officers handcuffed Vincent. But the hearing stops at the point where Hall handcuffs Vincent. The government presented no testimony about what they found in the search. The government's motion states as follows:

> As Vincent rolled onto his left side, Detective Hall noticed Vincent's shirt was pulled up, which exposed a plastic bag attached to the drawstring on his shorts. The bag contained numerous other bags that had a clear crystal substance that later tested to be 24 grams of methamphetamine. Detective Hall is aware based upon his training and experience that drug traffickers often hide narcotics in this manner . . . Detective Hall looked in the back window of the SUV and observed in plain view what appeared to be an SKS rifle in the back of the vehicle. The rifle was accessible to the passengers in the rear seat. The rifle had a scope on it and was not loaded . . . Detective Hall then entered the vehicle and pulled in forward to get it out of the roadway. He then picked up a little black case that he had observed fall from the vehicle and asked Vincent if the case was his. Vincent said that it was. Inside the case was a set of scales, a lighter, $110.00 in currency, a pipe with marijuana residue and a bag containing .079 grams of crystal methamphetamine.

Government's Response To Defendant's Motion To Suppress Evidence (Doc. #40) filed November 18, 2004, 5-7.

- 4 -

The Supreme Court has identified three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment, see, e.g., Michigan v. Chesternut, 486 U.S. 567, 574-76 (1988); (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity, see, e.g., United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968); and (3) arrests, the most intrusive of Fourth Amendment seizures, which are reasonable only if supported by probable cause. See, e.g., Hayes v. Florida, 470 U.S. 811, 815-16 (1985); United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996); United States v. Little, 18 F.3d 1499, 1504 n.5 (10th Cir. 1994). The government argues that the encounter between the officers and the occupants of the car began as a consensual encounter. When the driver ducked, however, the government asserts that the officers had a reasonable suspicion that the occupants were engaged in criminal activity which justified an investigative detention.

An officer who "stops" and briefly detains a person for questioning "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21 (1968). While an investigative detention does not require probable cause, it does demand "something more than an inchoate and unparticularized suspicion or 'hunch.'" United States v. Melendez-Garcia, 28 F.3d 1046, 1051 (10th Cir. 1994). In the course of a valid investigative detention, an officer may conduct a limited protective search ("frisk") if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous. United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1993); United States v. Santillanes, 848 F.2d 1103, 1108 (10th Cir. 1988).

In this case, when the officers initially walked toward the car they were attempting to initiate a consensual encounter. See Florida v. Royer, 460 U.S. 491, 497-98 (1983) (plurality opinion) (officer does not violate the Fourth Amendment simply by approaching an individual in a public place and asking him questions; individual need not answer any question put to him; indeed, he may decline to listen to questions at all and may go on his way). When the officers approached the vehicle, showed their badges and guns and told the occupants they wanted to talk to them, the officers did not have a reasonable articulable belief that the occupants had committed a crime. The officers' actions up to that point, however, did not constitute a show of authority sufficient to make a reasonable person believe that he was not free to leave. United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992). A reasonable person would have believed that he or she was free to either get out and talk with the officers or to drive away in a normal manner. When the driver ducked and the occupants began moving around, however, the officers reasonably believed that the occupants might be attempting to grab a weapon. At that moment, the officers had a reasonable and articulable suspicion that the occupants were engaging in criminal activity based on all of the circumstances: the car had pulled into the driveway of the residence of Vopata, whom the officers had just arrested for distributing methamphetamine, the officers knew that marijuana was in the house and knew that guns are often associated with drug trafficking. Most importantly, when the officers approached the vehicle, the driver ducked down and the other occupants began to move about in the vehicle. At that point the officers were reasonably concerned for their safety. See Terry, 392 U.S. at 27 ("officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger"); cf. United States v. Davis, 94 F.3d 1465, 1467-68 (no reasonable suspicion based on facts

that defendant got out of car parked outside known criminal establishment; officers knew defendant was an ex-convict; defendant refused to stop when directed and kept his hands in his pockets).

Defendant asserts that the officers' actions in rushing the vehicle with guns drawn was unreasonable, citing United States v. King, 990 F.2d 1552 (10th Cir. 1993). In King, an officer approached a car in a traffic jam because the driver was honking the car horn incessantly. When she approached, the officer saw a firearm in plain view on the front seat by the driver. The officer then conducted a Terry stop and frisked the driver at gunpoint. The Tenth Circuit found that her actions were unreasonable, noting that state law allowed transporting firearms in the passenger compartment of a vehicle.[6] In King, however, the officer did not testify that she was concerned for her safety. The government argues that King is factually distinguisable from the instant case, and the Court agrees. Here, once the driver began to duck, the officers reasonably feared for their safety and reasonably searched the occupants and the car. Terry, 392 U.S. at 27 (stop and search for protection of police officers and others nearby must be confined in scope to intrusion reasonably designed to discover hidden weapons which could be used to assault officers). Here, once the driver began to duck, it was reasonable for the officers to believe that the occupants might have weapons, and therefore to search the occupants and the car.

The Government relies upon United States v. Perdue, 8 F.3d 1455 (10th Cir. 1993). In Perdue, the Tenth Circuit Court determined that officers had an objectively reasonable basis to suspect that the defendant was involved in criminal activity. Law enforcement officers observed

---

[6] The Tenth Circuit noted that in a state where it is illegal to transport firearms in the passenger compartment of a car, the officer would have had probable cause to arrest the driver upon observing the pistol, and her actions would have been reasonable.

defendant driving down a rural lane to property which law enforcement officers were searching for marijuana. When they observed the automobile suddenly turn around in an attempt to leave after coming into view of police activity, they stopped the car with weapons drawn. The Court ruled that it was not unreasonable under the circumstances for the officers to execute a Terry stop with their weapons drawn. The Court noted that "[t]he use of guns in connection with a stop is permissible where the police reasonably believe [the weapons] are necessary for their protection." United States v. Merritt, 695 F.2d 1263, 1273 (10th Cir. 1982); see also United States v. Alvarez, 899 F.2d 833, 838 (9th Cir. 1990) (police officers may draw their weapons without transforming an otherwise valid Terry stop into an arrest; United States v. Taylor, 857 F.2d 210, 214 (4th Cir. 1988); United States v. Serna-Barreto, 842 F.2d 965, 968 (7th Cir. 1988); United States v. Jones, 759 F.2d 633, 638 (8th Cir. 1985). Under the totality of the circumstances, the Franklin County detectives had reasonable and articulable suspicion necessary to conduct a Terry stop of the vehicle with their weapons drawn.

**IT IS THEREFORE ORDERED** that defendant's Motion To Suppress Evidence (Doc. #38) filed November 5, 2004, be and hereby is **OVERRULED**.

Dated this 20th day of January, 2005, at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge